## AFFIDAVIT

I, Colin Simons, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) currently assigned to the Burlington, Vermont Resident Agency of the Albany, New York Division. I have been a Special Agent for over 14 years. I am responsible for working a variety of criminal violations, to include violent crimes and gangs. I have also been the affiant to numerous federal complaints and search warrants pertaining to violent crime and drugs. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2. I submit this affidavit for two purposes. First, this affidavit is submitted in support of a finding of probable cause to search the residence located at 1 Fairview Street, Apartment 3, Barre Vermont (hereinafter referred to as the "Subject Property"), which is located at the corner of Prospect Street and Fairview Street, and described with greater particularity in Attachment A, which is attached hereto and incorporated herein. This affidavit is to support a warrant to search for evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846: distribution of controlled substances and conspiracy to distribute controlled substances, as described in Attachment B, which is attached hereon and incorporated herein.

3. In addition, I submit this affidavit to establish probable cause to believe that Prince Fletcher, aka "Fleet," violated 21 U.S.C. §§ 841(a) and 841(b)(1)(C) during the week of March 19, 2018 by knowingly and intentionally distributing cocaine base, a Schedule II controlled substance, and Michael Berrian, aka "Dutch," violated 21 U.S.C. §§ 841(a) and

1

841(b)(1)(C) during the week of April 9, 2018 by knowingly and intentionally distributing cocaine base, a Schedule II controlled substance.

4. This affidavit is based upon my training and experience, and the investigation of other law enforcement officers. More specifically, I know the information contained within this affidavit from multiple conversations I have had with Vermont State Police (VSP) Det. Jon Prack, and South Burlington Police Detective Michael Defiore, both assigned to the Vermont Drug Task Force (VDTF), as well as Bureau of Alcohol Tobacco Firearms and Explosives (ATF) Special Agent Eric Brimo. I have also reviewed reports written by Det. Prack and other VDTF detectives detailing facts of the investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact learned by law enforcement during the course of the investigation. Where I describe a statement, it is described in substance, not verbatim.

## Probable Cause

5. In March of 2018, the VDTF and ATF began an investigation into the distribution/sale of cocaine base in Barre, Vermont by Prince Fletcher, aka "Fleet," and Michael Berrian, aka "Dutch." The investigation determined Fletcher and Berrian are working together to distribute controlled substances in the Barre area.

6. The investigation has utilized two Cooperating Informants (CIs). The CIs will be identified as CI1 and CI2. Both are identified with further information recounted below.

## Buy from Fletcher

7. CI1 advised that he/she had purchased drugs from an individual who used the name "Fleet." CI1 does not have any felony convictions, and was assisting VDTF in exchange for consideration on two felony criminal charges for the sale of cocaine and possession

of cocaine; greater than 2.5 grams. CI1 was also paid for conducting controlled purchases. After conducting the below described drug purchase from Fletcher, the VDTF learned CI1 was conducting drug deals for Fleet without law enforcement's permission, including a controlled purchase from CI1 that was conducted by VDTF without CI1's knowledge. Thus, the VDTF stopped utilizing CI1 as a CI.

8. During the week of March 19, 2018, Det. Defiore met with CI1 at a pre-determined meeting location. CI1 advised that he/she had contacted Fleet and confirmed he had crack cocaine for sale, which is slang for cocaine base. CI1 confirmed Fleet was selling crack cocaine in varying quantities in Barre. CI1 further stated Fleet was currently selling crack out of a residence on Fairview Street in Barre. CI1 explained that he/she contacts Fleet via phone call. Det. Defiore conducted a search of CI1, and no contraband was found. CI1 called Fleet in the presence of Det. Defiore. A male voice answered the phone, and the CI1 asked, "Can I come see you?" The male said "Yes," and promptly hung up the phone. CI1 stated the male on the phone was known to him/her as Fleet.

9. Det. Defiore asked CI1 if he/she had a photograph of Fleet, and he/she showed Det. Defiore a Facebook page on CI1's phone that CI1 states was Fleet's Facebook page. The profile picture was of a black male wearing a New York Yankees ballcap, and the profile displayed the name of "Prince Hakeem Fletcher (prince of queens)."

10. Det. Defiore instructed CI1 to meet with Fleet and purchase $250.00 worth of cocaine base, which is what he/she stated Fleet charged for an eight ball (slang for an eighth of an ounce). CI1 stated the drugs usually weigh between 3.1-3.5 grams. Det. Defiore provided CI1 with $250.00 in prerecorded VDTF funds for the purchase of the cocaine base. CI1 was not outfitted with any recording devices.

11. Det. Defiore drove CI1 to the area of Prospect Street and Fairview Street in Barre. CI1 was dropped off and instructed to walk a specific route to the target residence on Fairview Street. CI1 was monitored by law enforcement as he/she walked towards the building in which the Subject Property is located. During this time, CI1 did not stop or meet with anyone and was under constant surveillance by law enforcement until CI1 entered the building at 1 Fairview Street.

12. Det. Defiore received a text message from CI1 stating "Waiting for him at the door." Det. Defiore instructed CI1 to meet after the deal with Det. Defiore at a pre-determined meeting location.

13. A short time later, VDTF Det. DiGenova observed CI1 leave the building at 1 Fairview Street and begin walking toward the pre-determined pickup location. CI1 did not meet with anyone during his/her trip to the predetermined meeting location. Det. Defiore picked up CI1 and debriefed CI1. CI1 turned over to Det. Defiore a plastic sandwich bag corner that contained a rocky substance, suspected to be cocaine base.

14. Det. Defiore conducted a search of CI1, and found no contraband. Det. Defiore also obtained a sworn recorded statement from CI1. CI1 stated that he/she communicated with "Fleet" through phone calls, and traveled to a residence on Fairview Street where he/she provided the VDTF funds to Fleet. Fleet then handed CI1 one package of crack cocaine. CI1 then left the building, and met up with Det. Defiore. According to Det. Defiore, CI1's statements were consistent with observations made by the surveillance team.

15. Det. Defiore weighed and tested the suspected cocaine base purchased from Fleet. The substance weighed approximately 3.3 grams in aggregate field tested positive for

cocaine base. The substance was sent to the Vermont Forensic Laboratory for further analysis and testing.

16. Det. Defiore provided the Facebook information that CI1 had provided to the Vermont Intelligence Center (VIC) in an attempt to identify Fleet. Det. Defiore was notified that there was a black male from New York State with the name Prince Fletcher. Det. Defiore was provided a DMV photograph from the New York State Intelligence Center (NYSIC), which Det. Defiore confirmed was the same person in the photograph on the Facebook page provided by CI1.

### Buy from Berrian

17. CI2 advised that he/she had purchased drugs from an individual it knew only as "Dutch," which CI2 and CI2's significant other were personally using. CI2 does not have any felony convictions and is working with the VDTF in exchange for consideration on pending charges of false information and obstruction. CI2 received assurances from investigators that its inculpatory statements regarding drug purchases would not be used against it.

18. After reviewing Fletcher's Facebook page as outlined in paragraph 16, Det. Prack noted that "Dutch Montega" was a possible Facebook profile for Dutch. Det. Prack provided the Dutch Montega Facebook profile to the VIC. The VIC reviewed that Facebook profile and utilized the Accurant database to identify a black male named Michael Berrian as a potential identity for Dutch. Det. Prack was provided a DMV photograph from the NYSIC for Michael Berrian. Det. Prack showed the DMV photograph of Berrian to CI2, who positively identified the person in the photograph as the man CI2 knew as "Dutch." I will therefore refer to "Dutch" as Berrian.

19. CI2 advised the VDTF that Berrian is selling cocaine base in the Barre area, which CI2 knew because CI2 had previously purchased cocaine base from Berrian in Barre. CI2 further stated that Berrian is selling two grams of crack cocaine for $200.00. CI2 advised he/she contacted Berrian, via phone, through phone calls and text messages.

20. During the week of April 9, 2018, Det. Prack met with CI2 at a pre-determined meeting location. CI2 advised Det. Prack that he/she had contacted Berrian and that Berrian had crack cocaine for sale. CI2 advised he/she just needed to call or text Berrian, and Berrian will walk from his residence located on Fairview Street in Barre to meet CI2.

21. CI2 was instructed to drive a specific route to Merchants Row in Barre, a location within walking distance of the Subject Property. Det. Prack instructed CI2 to meet with Berrian and purchase two grams of cocaine base from Berrian. Det. Prack provided CI2 with $200.00 in prerecorded VDTF funds for the purchase of the cocaine base. Det. Prack conducted a search of CI2 and Det. Michael Defiore conducted a search of CI2's vehicle, and no contraband or cash was found during either search. Det. Prack installed on CI2 and in CI2's vehicle a digital recorder, to record conversation between CI2 and Berrian.

22. CI2 drove a specific route to Merchants Row, in Barre where Berrian was expected to meet CI2. CI2 was under constant surveillance from members of the VDTF and SA Brimo, as he/she drove to the location. Numerous members of the VDTF and SA Brimo observed CI2 drive onto Merchants Row and park. CI2 did not stop or meet with anyone.

23. The DMV photograph of Berrian had been circulated to officers conducting surveillance prior to the controlled purchase. Det. Defiore observed Berrian leave the building located at 1 Fairview Street, and walk down Prospect Street in the direction of Merchants Row. VDTF Det. Wade Cochran and Det. Prack observed Berrian get into CI2's

vehicle. Det. Cochran and Det. Prack observed CI2's vehicle leave Merchants Row and travel on Prospect Street towards Fairview Street. A few minutes later, Det. Cochran, Det. Defiore, and SA Brimo observed Berrian exit CI2's vehicle and enter 1 Fairview Street. Det. Prack observed CI2 leave the area and drive to the pre-determined meeting location, where Det. Prack met with CI2. CI2 turned over to Det. Prack three small clear plastic baggies, which contained a white colored powder substance suspected to be cocaine base.

24. Det. Prack conducted a search of CI2 and Det. Defiore conducted a search of CI2's vehicle. No contraband or cash was found during either search. A sworn recorded statement was obtained from CI2. CI2 stated to Det. Prack that he/she had communicated with "Dutch" through a series of text messages and phone calls. CI2 advised he/she tried to purchase 3.5 grams of crack cocaine from "Dutch" but that "Dutch" could not do that much. CI2 stated "Dutch" could only do two grams. CI2 advised "Dutch" had stated the cost of two grams of crack would be $200.00. CI2 advised that he/she went to Merchants Row in Barre and met with "Dutch," who was on foot. CI2 advised that "Dutch" got into his/her vehicle and that he/she provided the VDTF funds to "Dutch." CI2 advised that "Dutch" handed CI2 two grams of crack. CI2 stated "Dutch" advised he did not have that much crack right now, and that when he came back he will have more. CI2 advised "Dutch" told him/her that he was leaving town Thursday, and would return on Friday. CI2 stated "Dutch" told him/her that his "brother" will be around, so if CI2 needed anything to just go direct with him. CI2 advised he/she dropped "Dutch" off near his residence located on Fairview Street, and that he/she then left the area to meet Det. Prack.

25. Det. Prack reviewed the recordings of the controlled purchase, which were consistent with the statements of CI2. The video depicted Berrian entering CI2's vehicle, and captured Berrian exchanging items with CI2.

26. Det. Prack weighed and tested the suspected cocaine base. The suspected cocaine base weighed approximately 1.6 grams in its original packaging. Det. Prack field-tested the suspected cocaine base that was purchased from Berrian, and the substance field-tested positive for cocaine base. The suspected cocaine base was sent to the Vermont Forensic Laboratory for further analysis and testing.

**Additional Information**

27. On April 9, 2018, Det. Prack spoke with U.S. Postal Inspector Jonathan Dunham in an attempt to learn about mail being delivered to Michael Berrian and Prince Fletcher at 1 Fairview Street, in the City of Barre, Vermont. USPI Dunham advised that he had spoken with the Barre Postmaster who had stated that the postal carrier does not know the name at that address but that there were some new people who moved in, and the carrier believed that apartment to be a drug location. USPI Dunham advised Det. Prack that the Postmaster also had heard that Apartment 3 is the suspected drug house, that the postal carrier knows almost everyone in the apartment building, and that Apartment 3 has new tenants from out of state whom "everyone thinks are selling drugs out of there, but the landlord can't do anything about it because there is no proof".

28. In the beginning of 2018, Det. Prack was advised Barre City Police Department Det. Joel Pierce that he received a complaint by a woman who claimed she was sexually assaulted by two black males named "Prince" and "Dutch." Det. Pierce asked if Det. Prack had any information on the two males.

29. On April 13, 2018, Det. Prack spoke on the phone with the sexual assault complainant from Det. Pierce's case. The complainant advised she met two black males named "Prince" and "Dutch" at a bar in Barre, and went to their apartment located on Fairview Street.

The complainant advised the apartment was located in the white apartment building on the corner of Prospect and Fairview Street, and was accessed through the door closest to Prospect Street. The complainant stated that upon entering the exterior door, the apartment is at the top of the stairs, and the doorway is the first door on the right. The complainant believed it was actually the only door at the top of the stairs.

30. On April 17, 2018, Det. Prack confirmed the complainant's statements that the white apartment building was on the corner of Prospect and Fairview Street, and the exterior door to access the apartment is located closest to Prospect Street. Det. Prack entered 1 Fairview Street, Barre, Vermont through this exterior door, and traversed the stairs. To the right at the top of the main staircase, Det. Prack observed a door labeled with the number 3. Det. Prack further confirmed it was the only door at the top of the stairs.

31. The exterior door used by CI1 to enter the building when he/she purchased cocaine base from Fleet, was the same exterior door law enforcement observed Berrian exit when CI2 purchased from Berrian. When Det. Prack entered the building on April 17, 2018, he also entered the same exterior door.

## Training and Experience

32. Based on my training, experience, and participation in other controlled substances investigations, I know the following:

    A. Both small and large scale drug traffickers often maintain, on hand, large amounts of U.S. Currency in order to finance their ongoing drug business;

    B. Controlled substance traffickers commonly maintain books, records, receipts, notes, ledgers, electronic/digital data, common carrier tickets, money

orders, and other documents relating to the transportation, acquisition and distribution of controlled substances;

C. Controlled substance traffickers commonly provide controlled substances on consignment to their clients;

D. The aforementioned books, records, receipts, notes, ledgers, etc. are commonly maintained where controlled substance traffickers can have ready access to them;

E. It is common for both small and large scale drug traffickers to secret contraband, proceeds of drug sales, and records of transactions in secure locations within their residence and/or other residences, either vacant or occupied by other members of the trafficking conspiracy (stash houses), and/or their businesses, to conceal them from law enforcement authorities;

F. Persons involved in both small and large scale drug trafficking commonly conceal in their residences, stash houses and businesses caches of drugs, large amounts of currency, financial instruments (including stocks, bonds, certificates of deposit, etc.), precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to the attainment and concealment of large sums of money acquired from engaging in narcotic trafficking activities;

G. When drug traffickers amass proceeds from the sale of drugs, the drug traffickers commonly attempt to legitimize these profits, i.e. "launder" the profits; to accomplish these goals, drug traffickers many times utilize domestic and foreign banks and/or financial institutions with their attendant services, including

sales of securities, cashier's checks, money drafts, letters of credit, etc.; that other entities used to "launder" monies include brokerage houses, real estate firms, shell corporation and purported legitimate business fronts;

H.    It is common practice for both small and large scale narcotic traffickers to travel to distribution areas to purchase and otherwise facilitate their trafficking; that after purchasing controlled substances, the traffickers will transport or cause to be transported narcotics to areas in which they will distribute them; and that the methods of transportation include, but are not limited to trains, commercial airlines, ocean-going vessels, private airplanes, rental and private automobiles, and government and contract mail carriers;

I.    Narcotics traffickers commonly maintain address or telephone numbers in books, documents and electronic/digital devices/media that relate names, addresses and/or telephone numbers of their associates in the trafficking organization;

J.    Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residence and/or businesses of the traffickers, frequently in electronic devices such as cellular telephones;

K.    The courts have recognized that the unexplained wealth is probative evidence of crimes motivated by greed, in particular trafficking in controlled substances; and

L.    Drug traffickers commonly have in their possession (that is on their persons, in their vehicles, and at their residences and/or their businesses),

11

ammunition and firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers and other weapons; that said ammunition and firearms are used to protect and secure a drug trafficker's property.

### Conclusion

33. For the reasons outlined above, I believe there is probable cause to believe that the Subject Property, further described in Attachment A, contains evidence, instrumentalities, and fruits of crimes as described further in Attachment B.

34. In addition, I submit there is probable cause to believe that Prince Fletcher, aka "Fleet," violated 21 U.S.C. §§ 841(a) and 841(b)(1)(C) during the week of March 19, 2018 by knowingly and intentionally distributing cocaine base, a Schedule II controlled substance, and Michael Berrian, aka "Dutch," violated 21 U.S.C. §§ 841(a) and 841(b)(1)(C) during the week of April 9, 2018 by knowingly and intentionally distributing cocaine base, a Schedule II controlled substance.

Dated at Burlington, in the District of Vermont, this 18th day of April, 2018.

_____
Colin M. Simons
FBI Special Agent

Sworn and subscribed before me this 18th day of April, 2018.

_____
John M. Conroy
United States Magistrate Judge